# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **BRANDON TIMMONS,** | : | |
|     **Plaintiff** | : | |
| | : | No. 1:20-cv-02393 |
|     v. | : | |
| | : | (Judge Kane) |
| **F. WALTERS, et al.,** | : | |
|     **Defendants** | : | |

## MEMORANDUM

This is a prisoner civil rights case in which pro se Plaintiff Brandon Timmons ("Timmons") alleges that Defendants violated his civil rights by interfering with his mail for several months beginning in late 2020. After the Court granted in part and denied in part Defendants' motion for summary judgment, the case proceeded solely as to Timmons's retaliation claims against Defendants Tomcavage and Styka. The Court conducted an evidentiary hearing on August 20, 2024, to determine whether Defendants could establish the affirmative defense of failure to exhaust administrative remedies. Based on the testimony and other evidence adduced during the evidentiary hearing, and for the reasons that follow, the Court finds that Timmons failed to exhaust administrative remedies with respect to his remaining claims. Accordingly, the Court will enter judgment in favor of Defendants and close this case.

**I.    BACKGROUND AND PROCEDURAL HISTORY**

Timmons initiated this case through the filing of a civil rights complaint pursuant to 42 U.S.C. § 1983 on December 21, 2020. (Doc. No. 1.) The case is proceeding on Timmons's third amended complaint. (Doc. No. 79.) According to the allegations in the third amended complaint, the Defendants tampered or interfered with Timmons's mail on several occasions between 2020 and 2021 while Timmons was incarcerated in Frackville State Correctional Institution ("SCI-Frackville"). (Id.) Defendants answered the third amended complaint on

August 29, 2022.  (Doc. No. 80.)  Following the close of fact discovery, Defendants moved for summary judgment on May 1, 2023.  (Doc. No. 110.)

The Court granted the motion in part and denied it in part on December 18, 2023.  (Doc. Nos. 138–39.)  The Court concluded, inter alia, that genuine issues of material fact as to whether Timmons exhausted administrative remedies precluded summary judgment with respect to Timmons's retaliation claim against Defendant Tomcavage and his claims against Defendant Styka.  (Doc. 138 at 10–14.)  Specifically, the Court concluded that there was a genuine dispute of material fact as to whether prison officials processed several grievances Timmons purportedly attempted to file regarding his claims against Tomcavage and that there was a genuine issue of material fact as to whether Styka threatened Timmons in March 2020 in such a way that rendered the grievance process unavailable with respect to the claims against Styka.  (Id. at 13–14.)  The Court then found that summary judgment was warranted on the merits of all claims against Styka with the exception of the retaliation claim.  (Id. at 16–18.)  The Court accordingly denied the motion for summary judgment with respect to Timmons's retaliation claims against Tomcavage and Styka, but granted the motion in all other respects.  (Id. at 20; Doc. No. 139 at 1.)  After denying the parties' cross motions for reconsideration of the summary judgment ruling, see (Doc. No. 155), the Court scheduled the case for an evidentiary hearing to determine whether Defendants could establish the affirmative defense of failure to exhaust administrative remedies, see (Doc. No. 156).  After two short continuances, the Court conducted the evidentiary hearing on August 20, 2024.  (Doc. No. 168.)

## II.    EVIDENTIARY HEARING

During the evidentiary hearing, the Court heard testimony from Timmons, Styka, Tomcavage,[1] Beth Lazusky, and Michael Bell.  Timmons, called as on cross by Defendants in their case in chief, testified that Styka threatened him on March 14, 2021, and March 20, 2021.  (Transcript, Doc. No. 170 at 4.)[2]  Timmons testified that he attempted to file a grievance about the purported retaliation by Tomcavage on June 2, 2021, but that the grievance was never processed by prison officials.  (Id. at 5.)  Counsel for Defendants asked Timmons whether he had brought a copy of the grievance with him, and Timmons stated that the relevant grievance was attached to his summary judgment exhibits.  (Id.)  Counsel then admitted into the evidentiary record Exhibits D6, D7, and D8, which are copies of grievances that Timmons purportedly attempted to file on June 15, 2021, August 20, 2021, and October 28, 2021.  (Exs. D6, D7, D8; Doc. Nos. 169-1, 169-2, 169-3.)[3]

Styka, called as the second witness in the Defendants' case in chief, testified that she worked at SCI-Frackville for thirteen (13) years until her last day in the prison on September 10, 2021.  (Transcript, Doc. No. 170 at 10.)  Styka testified that at the time of the events giving rise to this suit, she was a unit manager in the prison working in the Restricted Housing Unit

---

[1] Tomcavage clarified during her testimony that after the events at issue in this lawsuit she changed her last name to Adamcik.  The Court will continue to call the Defendant "Tomcavage" in conformity with the earlier opinions and orders in this case and the parties' style conventions throughout this case.

[2] An official transcript of the evidentiary hearing was added to the court's electronic docket at Doc. No. 170.  All citations to the transcript will cite to the page numbers corresponding to the Court's electronic docket.

[3] At the conclusion of the hearing, the Clerk of Court scanned all admitted exhibits into the electronic docket of this case.  The Court cites the exhibits by both their exhibit numbers and their docket numbers on the electronic docket.

("RHU"). (Id. at 10–11.) She testified that as a unit manager, it was not her job to handle the inmates' mail and that she would only do so when they asked her. (Id. at 11.) She testified that she sometimes handled mail on behalf of Timmons, who would slide the mail through the crack of his cell door to her. (Id. at 12.) After receiving the mail from Timmons, Styka testified that she would place the mail directly into the mailbox, which was across the hall from Timmons's cell. (Id.) Styka testified that the mailbox was locked and that she did not have a key to the mailbox. (Id.)

Styka further testified that she never threatened Timmons with bodily harm or in any other way. (Id.) Defendants' counsel reminded Styka of Timmons's allegation and testimony that she threatened him with physical harm on March 14, 2021, but Styka testified that she was not working in the prison on that day because she was out on leave from March 11, 2021 to March 22, 2021 because she had COVID-19. (Id. at 12–13.) Styka additionally testified that March 20, 2021, the second date on which she purportedly threatened Timmons, was a Saturday, and that she did not work on Saturdays at that time because she maintained a Monday-to-Friday work schedule. (Id. at 13–14.)

With respect to the events of June 2021, Styka stated that she was working as the unit manager in the RHU on June 2, 2021. (Id. at 14.) Styka testified that it would be unusual for another unit manager to come into her unit while she was working and that this generally only happened when the other unit manager was needed to assist in an emergency. (Id.) Styka stated that she could not recall any emergency occurring on June 2, 2021, that necessitated the presence of another unit manager. (Id.) Styka then reiterated on cross examination by Timmons that she was not in the prison on March 14, 2021, or March 20, 2021, and therefore did not have any contact with Timmons. (Id.)

4

Tomcavage, called as the third witness in the Defendants' case in chief, testified that she has worked at SCI-Frackville since 2015 and that she was a unit manager in the prison's B-Block at the time of the events that give rise to this case. (Id. at 16–17.) Tomcavage stated that while she was a unit manager on B-Block, she would occasionally assist in the RHU when the RHU unit manager, who at the time was Styka, needed assistance. (Id. at 17.) Tomcavage testified that she occasionally handled inmate grievances as a unit manager, but that it was not her job to handle the grievances when they were initially submitted. (Id. at 17–18.) Rather, Tomcavage testified, she would "handle them on the back end, delivering responses, delivering proof of service, kind of pink copies as the inmates call them." (Id. at 18.) Tomcavage testified that when she delivered a copy of a grievance to an inmate, "[t]hey would initially get a pink copy, which is showing them proof that their grievance was received and filed, and the number would be assigned to it." (Id.) Tomcavage would then distribute the response to the grievance to the inmate once a response had been issued. (Id.) The response would be issued on white paper. (Id.)

Tomcavage testified that she could not recall any instances in which she threatened Timmons. (Id.) She further testified that she could not recall if she was working on June 2, 2021. (Id.) Defendants' counsel asked her if there was any reason that she would have been on the RHU that day, to which Tomcavage responded, "Very limited. The only time I can think of is if I was doing a meeting, I would be in that area, but otherwise, no, there's no reason for two managers to be on the same unit." (Id. at 18–19.)

Beth Lazusky, called as the fourth witness in Defendants' case in chief, testified that she is employed as the superintendent's assistant at SCI-Frackville, and that she acts as the prison's grievance coordinator in that role. (Id. at 20.) At the time of the events giving rise to this

5

lawsuit, she was the superintendent's secretary at SCI-Frackville. (Id.) Lazusky testified that she was familiar with the DOC's grievance policy, DC-ADM 804, at which point the Court granted Defendants' request to admit DC-ADM 804 into the record as Exhibit D1. (Id.; Ex. D1, Doc. No. 169-4.)

Lazusky testified to the general process by which grievances were submitted and processed under DC-ADM 804. (Transcript, Doc. No. 170 at 22.) According to Lazusky's testimony, when an inmate requests a grievance, he is given a packet with four copies of the grievance. (Id.) The inmate keeps the goldenrod copy of the grievance and submits the other three into the grievance box. (Id.) The grievance coordinator then collects the grievance from the box and assigns it a number. (Id.) Once the grievance is assigned a number, the pink copy of the grievance is returned to the inmate and the white and yellow copies are kept by the grievance coordinator. (Id.)

After summarizing the process for the submission and processing of grievances and which copies would go where, Lazusky reviewed Exhibit D6—the grievance that Timmons purportedly attempted to file on June 15, 2021—and stated that this was the "canary" or "yellow" copy of the grievance. (Id. at 24.) Lazusky noted that the yellow copy of the grievance is ordinarily supposed to be in the grievance coordinator's records if a grievance has been submitted properly. (Id.) Lazusky similarly testified that Exhibits D7 and D8—the grievances that Timmons purportedly attempted to file on August 20, 2021, and October 28, 2021—were the "canary" or "yellow" copies of the grievances. (Id. at 24–25.) Defendants' counsel asked Lazusky whether there was any reason for an inmate to have the yellow copy of a grievance after the grievance was submitted, and Lazusky testified that there was not. (Id. at 25.) Lazusky reiterated that only the pink and the goldenrod copies of the grievance would be in the inmate's

6

possession. (Id.) Lazusky further testified that the yellow and goldenrod copies look "[v]ery different" from one another. (Id.)

Lazusky testified that the DOC tracks the filing of grievances using an electronic system called "Captor." (Id. at 25–26.) Every grievance filed in a DOC facility is documented in the grievance history on Captor. (Id. at 26.) Lazusky confirmed that the absence of a grievance in the Captor system may indicate that the grievance was never received by a facility. (Id.) An inmate's grievance history on Captor is updated regularly by the facility's grievance coordinator. (Id.) Lazusky testified that she reviewed Timmons's grievance history on Captor prior to the hearing. (Id.) The Court then admitted Timmons's grievance history as exhibit D2. (Id. at 27; Ex. D2, Doc. No. 169-5.)

Reviewing Timmons's grievance history, Lazusky testified that Timmons filed four grievances in March 2021—grievance numbers 917002, 917009, 920026, and 920031—and four grievances in June 2021—grievance numbers 930039, 930047, 931226, and 931254. (Transcript, Doc. No. 170 at 27–28.) After Lazusky confirmed the accuracy of the grievance documents, the Court granted counsel's request to admit the grievance packets for all of these grievances as Exhibits D10, D11, D12, D33, D34, D35, D36, and D37. (Id. at 27–32; Doc. Nos. 169-6, 169-7, 169-8, 169-9, 169-10, 169-11, 169-12, 169-13.)

Defendants' counsel asked Lazusky how an inmate could follow up on a grievance if they believed they had not received a response to a grievance in a timely manner. (Transcript, Doc. No. 170 at 32.) Lazusky stated that follow-up requests could be submitted on inmate request forms, known as DC-135s. (Id.)

Lazusky confirmed that staff members entering SCI-Frackville must swipe into the building using a keycard. (Id. at 32–33.) Lazusky testified that the employees' keycard swipes

7

are documented in a system called "[b]iometrics" or the "IDVS system." (Id. at 33–34.) The Court then admitted into the evidentiary record, over Timmons's authenticity objection, Exhibit D13, which is a printout of Defendant Styka's swipe-in information from March 14, 2021, to March 20, 2021. (Id. at 38; Ex. D13, Doc. No. 14.) The Court similarly admitted over Timmons's objection Exhibits D25 and D39, which are printouts of Styka's swipe-in data from June 1, 2020, to June 2, 2020, and June 2, 2021. (Transcript, Doc. No. 170 at 39–40; Ex. D25, Doc. No. 169-15; Ex. D39, Doc. No. 169-16.) Lazusky testified that if an employee did not have swipe-in data in the IDVS/biometrics system, that meant that the employee was not present in the prison that day. (Transcript, Doc. No. 170 at 41.)

On cross examination, Timmons asked Lazusky what the process was for an inmate to file a grievance at one institution after he was transferred to another institution. (Id. at 41–42.) Lazusky testified that the inmate would need to send the grievance through the mail to his previous institution. (Id. at 42.) Once the grievance is received at the new institution, Lazusky testified that a copy of the grievance would be sent to the inmate through the mail at his new institution. (Id.) Lazusky confirmed, however, that if the prison never received a grievance, it would not send a copy back. (Id.) Lazusky additionally testified that she had never seen a situation where prison officials interfered with the filing of grievances. (Id. at 44.)

On redirect examination, Lazusky testified that there was no grievance coordinator signature on Exhibits 6, 7, and 8, which Lazusky confirmed meant that the grievances were not received by the prison. (Id. at 46.) Lazusky also testified that the grievances did not have any stamp indicating that they were received by the prison or any assigned grievance number, which indicated that the prison never received the grievances. (Id. at 47.)

Michael Bell, called as the fifth witness in Defendants' case in chief, testified that he is employed as a grievance officer in the DOC's Secretary's Office of Inmate Grievances and Appeals ("SOIGA"). (Id. at 48.) Bell testified that he reviewed SOIGA's records for any appeals filed by Timmons in 2021. (Id. at 49–50.) Bell testified that SOIGA did not receive any appeals or other correspondence regarding the grievances filed as Exhibits D6, D7, or D8. (Id. at 50.)

On cross examination, Timmons asked Bell what procedures an inmate could use to follow up on a grievance if he did not receive a response. (Id. 51–52.) Bell stated that the inmate could send correspondence to the prison's grievance coordinator or send an additional grievance in such a situation. (Id. at 52.) Bell testified that an inmate could not properly appeal to SOIGA until he had completed the first two steps of the DOC's grievance process. (Id.)

At the conclusion of Defendants' case in chief, Timmons testified on his own behalf. (Id. at 53.) Timmons testified that "[t]hey actually threatened me when I initially tried to put the grievances in and they never responded to the grievances." (Id. at 54.) Timmons testified that he never filed a grievance against Styka, which he said was due to threats from her. (Id. at 54–55.) Timmons testified that he "attempted to file about ten grievances about this mail, and I was threatened in the month of March by Styka, in the month of March, 2021, by Styka about putting grievances in her name, not to put a grievance in her name." (Id. at 55.)

Following Timmons's testimony, the Defendants presented a rebuttal case in which they recalled Beth Lazusky to the stand. (Id. at 58.) Lazusky testified that as the superintendent's assistant, she had access to an employee's leave reports. (Id.) Lazusky testified that she reviewed Styka's leave reports for March 2021 prior to the hearing. (Id.) The Court granted Defendants' request to admit Styka's leave report for March 2021 over Timmons's objection and

9

docketed the exhibit as exhibit D14. (Id. at 61; Ex. D14, Doc. No. 169-17.) Lazusky testified that the leave report indicated that Styka was out on COVID-19 leave during this period. (Transcript, Doc. No. 170 at 61.)

At the conclusion of testimony, the parties provided closing arguments. Defendants' counsel argued that Timmons had not provided any evidence to support his arguments that he was threatened by Styka in March 2021 or that prison officials failed to respond to grievances that Timmons purportedly sent in June 2021, August 2021, and October 2021. (Id. at 61–62.) Timmons argued that he attempted to file grievances but that officials did not respond, and that Styka threatened him. (Id. at 64–65.) Defendants' counsel then presented a brief rebuttal argument. (Id. at 65.)

### III.   LEGAL STANDARD

Under the Prison Litigation Reform Act ("PLRA"), prisoner plaintiffs must exhaust all available administrative remedies before they may challenge the conditions of their confinement in federal court. See 42 U.S.C. § 1997e(a); Downey v. Pa. Dep't of Corr., 968 F.3d 299, 304 (3d Cir. 2020). The statute requires "proper exhaustion," meaning the prisoner must complete the administrative review process in accordance with the procedural rules set by the prison. See id. at 305 (citing Woodford v. Ngo, 548 U.S. 81, 88 (2006)). The failure to exhaust available administrative remedies is an affirmative defense. See Jones v. Bock, 549 U.S. 199, 216 (2007). Accordingly, "the burden to plead and prove failure to exhaust as an affirmative defense rests on the defendant." See Rinaldi v. United States, 904 F.3d 257, 268 (2018) (citing Ray v. Kertes, 285 F.3d 287, 295 (3d Cir. 2002)).

A prisoner is only required to exhaust administrative remedies that are "available." See id. at 266 (citing Woodford, 548 U.S. at 93). An administrative remedy is unavailable, and

10

administrative exhaustion is thus excused, in three situations: "(1) when 'it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates'; (2) when it is 'so opaque that it becomes, practically speaking, incapable of use,' such as when no ordinary prisoner can discern or navigate it; or (3) when 'prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation.'" See id. at 266–67 (quoting Ross v. Blake, 578 U.S. 632, 643–44 (2016)). Although the burden to establish the affirmative defense of failure to exhaust administrative remedies rests on the defendant, "once the defendant has established that the inmate failed to resort to administrative remedies, the onus falls on the inmate to show that such remedies were unavailable to him." See id. at 268.

District courts "may resolve factual disputes relevant to the exhaustion issue without the participation of a jury." See Paladino v. Newsome, 885 F.3d 203, 210 (3d Cir. 2018) (citing Small v. Camden County, 728 F.3d 265, 271 (3d Cir. 2013)). Exhaustion is a "preliminary issue for which no right to a jury trial exists." See Small, 728 F.3d at 271.

## IV.     FINDINGS OF FACT

Based on the testimony and evidence presented during the August 20, 2024, evidentiary hearing, the Court makes the following findings of fact regarding Timmons's remaining retaliation claims against Defendants Tomcavage and Styka:

1. DC-ADM 804 is the DOC's grievance process. See (Ex. D1, Doc. No. 169-4).
2. A prisoner seeking to exhaust administrative remedies under DC-ADM 804 must submit a written grievance within fifteen (15) working days from the date of the incident. See (id. § 1(A)(11), Doc. No. 169-4 at 5).

3.  To appeal an adverse ruling, the prisoner must submit a written appeal to the facility manager within fifteen (15) working days. See id. § 2(A)(1)(a), Doc. 169-4 at 15).

4.  To appeal an adverse decision from the facility manager, the inmate must submit an appeal to SOIGA within fifteen (15) working days. See (id. § 2(B)(1)(b), Doc. 111-1 at 19).

5.  Timmons was housed in SCI-Frackville until he was transferred to SCI-Dallas on or around June 17, 2021. See (Doc. No. 35).[4]

6.  Timmons did not file any grievances against Defendant Styka during the period of time relevant to this lawsuit. See (Transcript, Doc. No. 170 at 54–55).

7.  The Court finds Styka's testimony credible that she was not present in SCI-Frackville on March 14, 2021, or March 20, 2021, because she was out on leave from March 11, 2021, to March 22, 2021, with COVID-19. See (id. at 12–13).

8.  Records from the DOC's IDVS/biometrics system and SCI-Frackville's leave tracking system confirm that Styka was not present in the prison on March 14, 2021, or March 20, 2021. See (Ex. D13, Doc. No. 169-14; Ex. D13, Doc. No. 169-17).

9.  The Court finds Timmons's testimony that Styka threatened him on March 14, 2021, and March 20, 2021 not credible. Timmons did not testify to anything other than conclusory and vague statements of threats by Styka. (Transcript, Doc. No. 170 at 4, 54–55.) Based on the lack of detail in Timmons's testimony,

---

[4] Neither party introduced evidence during the hearing to establish the date on which Timmons was transferred to SCI-Dallas, but the Court takes judicial notice of the notice of change of address that Timmons filed on June 17, 2021. See (Doc. No. 35).

       Timmons's demeanor during his testimony, and the testimony from Styka and documentary evidence showing that Styka was not present in SCI-Frackville on these dates, the Court finds that Timmons's account of threats by Styka during the relevant period is not credible.

10. Timmons did not appeal any grievances raising his claims against Tomcavage through final review by SOIGA. <u>See</u> (Transcript, Doc. No. 170 at 48–50).

11. The Court finds not credible Timmons's assertion that he attempted to submit a grievance against Tomcavage on June 15, 2024. Timmons did not testify in any detail to the actions he took to submit this grievance other than stating in conclusory fashion that he submitted it. <u>See</u> (<u>id.</u> at 54). Additionally, Lazusky testified credibly that the copy of this grievance that Timmons produced in this case was on a yellow copy, but that if a grievance has been properly submitted, the yellow copy would no longer be in the inmate's possession. <u>See</u> (<u>id.</u> at 24–25). Based on the lack of detail offered during Timmons's testimony, Timmons's demeanor during his testimony, and Lazusky's testimony, the Court finds Timmons's testimony not credible.

12. After his transfer to SCI-Dallas on or around June 17, 2021, any grievances Timmons filed regarding actions at SCI-Frackville needed to be submitted through the mail. <u>See</u> (Transcript, Doc. No. 170 at 41–42).

13. Timmons did not submit any evidence showing that he mailed the grievances he purportedly attempted to send on August 20, 2021, and October 28, 2021, such as postal records or proof of payment of postage.

14. Based on the lack of evidence that Timmons mailed the grievances on August 20, 2021 and October 28, 2021, Timmons's demeanor during his testimony, and Lazusky's testimony that the grievances were on yellow copies that would not be in Timmons's possession if the grievances had been properly submitted, see (id. at 24–25), the Court finds Timmons's testimony that he mailed grievances to SCI-Frackville on August 20, 2021 and October 28, 2021 not credible.

## V. CONCLUSIONS OF LAW

Based on the above findings of fact, the Court reaches the following conclusions of law:

1. Defendants have met their burden to show that Timmons failed to exhaust administrative remedies with respect to his remaining claims against Defendants Tomcavage and Styka.

2. Timmons has not met his burden to show that the grievance process was unavailable to him.

## VI. CONCLUSION

For the foregoing reasons, the Court will enter judgment in favor of Defendants and close this case. An appropriate Order follows.

s/ Yvette Kane
Yvette Kane, District Judge
United States District Court
Middle District of Pennsylvania